This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

v.                                    **No. A-1-CA-35386**

**SAVONA JAMES**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY**
**Robert A. Aragon, District Judge**

Hector Balderas, Attorney General
Santa Fe, NM
Elizabeth Ashton, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**GALLEGOS, Judge.**

**{1}** Following a jury trial, Defendant Savona James was convicted of voluntary manslaughter, contrary to NMSA 1978, Section 30-2-3(A) (1994). Defendant appeals her conviction, raising three issues: (1) the evidence was insufficient to establish that her actions caused Kimberly Yazzie's (Victim) death; (2) she was denied a fair trial when the district court refused to excuse a particular juror for cause; and (3) the district court erred in denying her motion for a new trial based on the jury's consideration of new evidence during its deliberations. Unpersuaded by Defendant's arguments, we affirm.

**BACKGROUND**

**{2}** On the evening of July 3, 2014, a fight took place in a vacant dirt lot in Gallup, New Mexico. On one side of the altercation was Defendant and her sister. On the other side was Victim and her girlfriend, Gilithia Tom. Part of the altercation was recorded by a bystander, Joshua Smith, on his cell phone. It is unclear from the video how the altercation started or how the various individuals gathered around were involved. However, according to Mr. Smith's testimony at trial, some of the individual onlookers had been "hanging out and drinking" all day.

**{3}** At some point, a small group of five people approached the area where Mr. Smith was hanging out, and the group was followed by two people yelling "westside." According to Defendant, it was her sister who was yelling "westside." A

confrontation ensued over the things being said by people in both groups, and the confrontation became physical. In the video, all four of the women—Defendant and her sister versus Victim and Ms. Tom—can be seen fighting with each other. At one point, Defendant throws Victim to the ground and then appears to kick Victim in the head. Victim appears to be unconscious for a short period of time, before she slowly makes her way to her feet. While she is recovering, Defendant and Ms. Tom exchange blows. The fight disperses shortly thereafter.

{3}     According to Ms. Tom's testimony at trial, she and Victim returned to their tent encampment following the fight. At some point during the night, both Ms. Tom and Victim arose to go to the restroom. Ms. Tom went into town the next morning around 7 a.m., and claims that she spoke with Victim at that time. When Ms.Tom returned later that afternoon around 4 p.m., she discovered Victim dead in her tent.

{4}     Following an investigation, which included an autopsy, Defendant was arrested in connection with Victim's death. Defendant was ultimately convicted by a jury of voluntary manslaughter based on her kick to Victim's head during the July 3, 2014 altercation. Because this is a memorandum opinion and both parties are familiar with the facts, additional facts and procedural history will be provided throughout this opinion only as necessary.

**DISCUSSION**

**Sufficiency of the Evidence**

{5}     The first issue on appeal is whether there was sufficient evidence to support Defendant's conviction for voluntary manslaughter. In criminal cases, "[t]he test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). The reviewing court "view[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

{6}     In order to prove that Defendant committed voluntary manslaughter, the State was required to prove:

    (1)    [D]efendant killed [Victim];

    (2)    [D]efendant did not act in self-defense;

    (3)    [D]efendant knew that her acts created a strong probability of death or great bodily harm to [Victim];

    (4)    [D]efendant acted as a result of sufficient provocation;

> (5) This happened in New Mexico on or about the 3rd day of July, 2014.

*See* UJI 14-220 NMRA; *see also State v. Smith*, 1986-NMCA-089, ¶ 6, 104 N.M. 729, ¶ 7, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured.").

{7} On appeal, Defendant challenges only the first element, arguing that the evidence presented at trial was insufficient to prove that she caused Victim's death. Defendant depends in large part on the testimony of Chief Medical Investigator, Dr. Ross Zumwalt, that Victim's physical condition at the time of the incident—suffering from cirrhosis of the liver, intoxication, and with a previous subdural hematoma—made her susceptible to a brain bleed. The crux of Defendant's argument is that *any* hit to the head, including a fall, could have been the cause of Victim's death. According to Defendant, such a hit to the head or fall could have taken place in the time period between the fight and Victim's death the next day. As a result, Defendant contends that the jury engaged in surmise or conjecture to conclude that it was her kick that caused Victim's death. *See State v. Vigil*, 1975-NMSC-013, ¶ 12, 87 N.M. 345, 533 P.2d 578 (stating that the appellate court cannot let a conviction stand where "the evidence must be buttressed by surmise and conjecture, rather than logical inference" (internal quotation marks and citation omitted)). We disagree.

5

**{8}** In light of Dr. Zumwalt's testimony that the cause of Victim's death was a subdural hemorrhage resulting from blunt force trauma to the head—and that death from an internal herniation, as occurred here, can happen from minutes to days later—along with the eyewitness testimony and video evidence showing Defendant kicking Victim in the head, we conclude that the evidence was sufficient to support the jury's verdict, even if Victim may have been more susceptible or vulnerable given her physical condition. *See State v.Montoya*, 2003-NMSC-004, ¶ 19, 133 N.M. 84, 61 P.3d 793 ("In cases where death results from multiple causes, an individual may be a legal cause of death even though other significant causes significantly contributed to the cause of death."). This is especially the case where Dr. Zumwalt testified that the kick seen in the video more likely than not supplied the blunt force resulting in the subdural hemorrhage.

**{9}** Moreover, the jury could have discounted, or refused to buy, Defendant's alternate theory of causation; that is, they did not have to believe that maybe another hit to the head, possibly after the fight had ended and the parties went their separate ways, was the actual cause of Victim's death. *See Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts."); *see also State v. Chandler*, 1995-NMCA-033, ¶ 15, 119 N.M. 727, 895 P.2d 249 (stating that when a

6

criminal defendant urges the equal-hypotheses argument, the appellate court's answer is that "the jury, by its verdict, has necessarily found the hypothesis of guilt more reasonable than any of the theories of innocence advanced by the defendant").

{10}    "View[ing] the evidence in the light most favorable to the . . . verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict[,]" *Cunningham*, 2000-NMSC-009, ¶ 26, we conclude that a rational jury could have found beyond a reasonable doubt that Defendant killed Victim by kicking her in the head.

**Juror Bias**

{11}    The next question on appeal is whether Defendant was denied a fair trial when the district court refused to excuse a particular juror for cause. Specifically, Defendant contends that the district court erred when it denied her motion to excuse a prospective juror who Defendant maintains indicated through her answers during voir dire that she could not be impartial. The decision to dismiss a juror for partiality is within the district court's discretion "because the [district court] judge can best assess a potential juror's state of mind." *State v. Gardner*, 2003-NMCA-107, ¶ 16, 134 N.M. 294, 76 P.3d 47. Because the district court has a "great deal of discretion in dismissing a juror for cause, . . . its decision will not be disturbed absent a manifest error or clear abuse

of that discretion." *State v. Wiberg*, 1988-NMCA-022, ¶ 21, 107 N.M. 152, 754 P.2d 529. The party claiming bias has the burden of proving it. *Id.*

{12}    During voir dire, a prospective juror indicated that her brother was murdered some fifteen years prior while attempting to separate two friends from fighting. In response to questioning by defense counsel, the prospective juror agreed that the current case was "close to home" and that this was not a correct case for her to sit as a juror. The prospective juror also indicated that she may have heard something about the case about a year prior and may have made up her mind that "something was wrong." However, she also stated that she would like "to think that there is a neutral aspect to this case[,] too."

{13}    The district court then had the following exchange with the prospective juror:

> District Court:    When a person comes up here, is sworn to his oath to tell the truth and testifies, you would not be able to listen objectively and carefully to his evidence and decide whether he is right or wrong or truthful or deceitful?
>
> Prospective Juror: I would be able to do that.
>
> District Court:    Despite this memory of the . . . murder in your own family fifteen years ago can be as vivid as if it happened last week . . . because of that, would you be able to set that aside and know that what you're deciding here is whether this lady is guilty or not guilty?
>
> Prospective Juror: Yes.

8

District Court: And that's completely unrelated to the tragic . . . murder of your brother fifteen years ago?

Prospective Juror: Yes, I can do that[.]

{14} Defendant subsequently moved to excuse the prospective juror for cause. The district court denied the motion, apparently satisfied that the prospective juror had been sufficiently rehabilitated and had demonstrated that she would be impartial. In reliance on *State v. Sims*, 1947-NMSC-071, ¶ 6, 51 N.M. 467, 188 P.2d 177, Defendant contends on appeal that any indication of impartiality on the part of the prospective juror resulted from the district court's "skillful" questioning, and, therefore, was unreliable. *See id.* ("It is difficult, if not impossible, to understand the reasoning which leads to the conclusion that a person stands free of bias or prejudice who having voluntarily and emphatically asserted its existence in his mind, in the next moment under skillful questioning declares his freedom from its influence." (internal quotation marks and citation omitted)).

{15} We believe *Sims* to be distinguishable. While the district court in *Sims* did go to some lengths to determine—or more to the point, to establish—the impartiality of the juror, the juror's own statements emphatically demonstrated his bias. The juror in *Sims* stated that he would "try to be fair" but that he was sure that he would be "prejudiced" against the defendant, and that he would rule against the defendant

9

should it "[come] to a fine point[.]" *Id*. ¶ 2. Against this backdrop, our Supreme Court was not convinced that the juror's final agreement that he could be fair demonstrated that the bias he had just expressed had dissipated. *Id*. ¶ 6. In contrast, while the prospective juror in the present case expressed at first that the subject matter hit "close to home" due to her brother's murder, she then indicated to the district court that she could set her brother's murder aside while deciding based on the evidence whether Defendant was guilty or not guilty.

{16}    The district court apparently concluded that the prospective juror could be impartial. Defendant's reliance on *Sims* does not convince us that the district court erred. That is, the prospective juror's initial hesitancy in this case does not rise to the level of bias or prejudice that was voluntarily and emphatically expressed by the juror in *Sims*. *See, e.g., State v. Olinghouse*, 605 S.W.2d 58, 69-71 (Mo. 1980) (determining no abuse of discretion under similar circumstances). Keeping in mind the great deal of discretion given to the district court in determining whether to excuse a juror for cause, we see no error in the district court's decision to deny Defendant's motion.

**The Viewing of Admitted, but Previously Unviewed, Video Evidence During Jury Deliberations**

{17} Defendant's final claim of error is that the jury improperly viewed evidence during its deliberations that had not been presented to the jury during trial. The evidence at issue is a videotaped interrogation between Detective Neil Yazzie and Defendant. Prior to trial, Defendant filed a motion in limine to exclude certain portions of the video because they contained statements that were purportedly unduly prejudicial or inadmissible under Rule 11-403 NMRA and Rule 11-404 NMRA. Specifically, Defendant objected to portions of the video discussing that (1) Defendant has been fighting since middle school; (2) Defendant has participated in at least ten fights; and (3) Defendant is an accomplished fighter. The district court granted Defendant's motion and excluded those specific portions of the interrogation on the basis of undue prejudice and lack of relevance due to remoteness in time.

{18} At trial, during Detective Yazzie's testimony, the State—apparently recognizing the attendant risk of mistakenly placing the inadmissible portions before the jury in the course of stopping, fast forwarding, and restarting the video—expressed to the district court that it decided to publish only the first 29 minutes and 2 seconds of the videotaped interrogation to the jury. This decision was apparently based on the fact that none of the inadmissible statements were contained in this first part of the video. The State asserted its right to use the balance of the video for impeachment purposes,

11

if necessary. It appears from the record that Defendant made no objection to this method of presenting the video to the jury.

{19} After outlining its proposed method of presenting the video to the jury, the State sought to admit the video into evidence, minus the portions ruled inadmissible by the district court. With no objection by Defendant, the district court admitted the video.

{20} During deliberations, the jury made a request to view the video. With no objection by either the State or Defendant, the jury was allowed to view the entire 1 hour and 4 minute video, excluding the inadmissible portions. Apparently realizing only after-the-fact that the jury viewed the entire video, Defendant moved for a new trial. The motion for a new trial was based on Rule 5-610(C) NMRA, which states that "[a]fter the jurors have retired to consider their verdict, the court shall not recall the jurors to hear additional evidence." The district court denied the motion. Defendant now appeals the district court's denial, and also complains that it was fundamental error for the jury to view the portion of the videotaped statement that was not originally played for them in open court during the trial.

{21} To begin, we note three instances wherein Defendant did not object to the admission of the entire video, which constitutes waiver of the issue. *See N.M. Att'y Gen. v. N.M. Pub. Serv. Comm'n*, 1984-NMSC-081, ¶ 10, 101 N.M. 549, 685 P.2d 957 ("Failure to object to the admission of evidence operates as a waiver."). The first

12

waiver occurred when Defendant failed to object to the State's initial request to admit the video into evidence, as detailed above. The second waiver took place during the conference on the State's request to show the jury the remainder of the video (including the previously redacted portions). The State made this request following Defendant's direct examination, based on its perception that Defendant had opened the door to the admission of the previously-ruled-inadmissible portions of the interrogation through her testimony. The district court disagreed that Defendant's testimony made those specific portions of the video admissible. However, the district court pointed out that "when [the video] was introduced it was accepted in its entirety." The district court continued, stating that "[it] was my understanding [that the State] moved for the admission of the statement" and that Defendant "did not object." Noting that the original ruling on the motion in limine would remain intact, the district court concluded that "[e]xcept for the specific exclusions that [were] identified, the whole thing is in." Defense counsel clarified, "Yes, Judge, except for the fighting." The State followed up by stating that it would provide the bailiff with specific times to avoid playing "should the jury want to review the statement." When asked if he was "ill at ease" with that solution, defense counsel answered in the negative.

{22} The third instance of waiver occurred when the jury asked to review the video during deliberations. Both the State and the defense agreed to let the jury view the video, with the State again pointing out that the specific times to avoid playing were marked on the video. The district court cautioned the bailiff who was going to play the video for the jury to "be very careful[.]"

{23} We also note that there is a fourth potential instance of waiver. The bailiff testified at the hearing on the motion for new trial that after being instructed in open court to show the jury the entire video, with the exception of the excluded portions, he returned to the trial judge's chambers and clarified—off the record—with the district court and the parties whether he was supposed to play the video "in its entirety." The bailiff testified that he was again told to play the entire video and that both sides agreed. However, the district court chose not to credit this instance of waiver because it took place off the record. We likewise will not count this instance of waiver against Defendant.

{24} However, in light of the fact that Defendant failed three times to object to the admission and viewing of the entire statement (minus the inadmissible portions), we conclude that the district court did not abuse its discretion in denying Defendant's motion for a new trial. *See State v. Garcia*, 2005-NMSC-038, ¶ 7, 138 N.M. 659, 125 P.3d 638 ("The general rule is that [the appellate court] will not disturb a [district]

14

court's exercise of discretion in denying or granting a motion for a new trial unless there is a manifest abuse of discretion."); *see also State v. Balderama*, 2004-NMSC-008, ¶ 22, 135 N.M. 329, 88 P.3d 845 ("An abuse of discretion occurs when the ruling is clearly against the logic and effects of the facts and circumstances of the case, is clearly untenable, or is not justified by reason.").

{25} To the extent Defendant raises this unpreserved and waived issue separately on appeal, we review only for fundamental error. *See Montoya*, 2015-NMSC-010, ¶ 45 ("In order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the [district] court of the nature of the claimed error and invokes an intelligent ruling thereon." (internal quotation marks and citation omitted)); *see also State v. Paiz*, 2011-NMSC-008, ¶ 33, 149 N.M. 412, 249 P.3d 1235 ("On appeal we only consider issues raised in the [district] court unless the issues involve matters of jurisdictional or fundamental error."); *State v. Anderson*, 2016-NMCA-007, ¶ 18, 364 P.3d 306 ("Our courts have consistently acknowledged that waiver does not preclude courts from protecting a defendant's rights on appeal where fundamental error exists.").

{26} We employ the fundamental error exception to the preservation rule "only under extraordinary circumstances to prevent the miscarriage of justice[.]" *State v. Silva*, 2008-NMSC-051, ¶ 13, 144 N.M. 815, 192 P.3d 1192 (internal quotation marks

and citation omitted). "Accordingly, we will use the doctrine to reverse a conviction only if the defendant's guilt is so questionable that upholding a conviction would shock the conscience, or where, notwithstanding the apparent culpability of the defendant, substantial justice has not been served. Substantial justice has not been served when a fundamental unfairness within the system has undermined judicial integrity." *Id.* (internal quotation marks and citation omitted).

{27} In support of her contention that the jury's viewing of the entire video constituted fundamental error, Defendant cites a single out-of-jurisdiction case, *Eslaminia v. White*, 136 F.3d 1234 (9th Cir. 1998). In *Eslaminia*, a federal habeas corpus case, the court determined that non-harmless constitutional error occurred when the jury listened during its deliberations to a taped witness statement that had not been admitted into evidence. *Id.* at 1239. The taped statement encompassed a conversation between police officers and a witness who did not testify at trial, the substance of which strongly supported the prosecution and seriously undermined the defense. *Id.* Clearly, the situation in *Eslaminia* was different from the case here, where the entire video (minus the redacted portions) was admitted into evidence and both Detective Yazzie and Defendant testified at trial. Thus, we are not convinced that the cases are so similar that we should rely, as Defendant requests, on the reasoning in *Eslaminia*.

**{28}** We further note that the district court denied Defendant's motion for new trial based on its conclusion that Defendant was not prejudiced by the jury's viewing of the entire video. In so concluding, the district court found that the balance of the interrogation video contained poorly defined and peripheral evidence. Defendant does not challenge these findings on appeal; instead, Defendant seeks to establish prejudice simply by its reliance on, and comparison to, *Eslaminia*. For the reasons noted above, we are not convinced that the analysis in *Eslaminia* applies here, especially where the court in that case determined that the substance of the unadmitted—but viewed—evidence strongly supported the prosecution and seriously undermined the defense. *Id.* at 1239. And moreover, given the fact that Defendant did not object to the balance of the video as more prejudicial than probative when she had the opportunity to do so, as she did via a motion in limine with respect to the portions ultimately excluded by the district court, we are not convinced that Defendant has established that she was prejudiced when the jury reviewed the remaining unobjected-to portions of her statement to Detective Yazzie. *See State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (stating that there is a presumption of correctness in the rulings or decisions of the district court, and the party claiming error bears the burden of showing such error); *see also In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice.").

17

**{29}** Finally, to the extent Defendant may be attempting to use *Eslaminia* to establish a violation of the Confrontation Clause or any other constitutional provision, we observe that any such issue is not adequately briefed and we need not consider it further. *See State v. Clifford*, 1994-NMSC-048, ¶ 19, 117 N.M. 508, 873 P.2d 254 (reminding counsel that the appellate courts "are not required to do their research"); *see also State v. Duttle*, 2017-NMCA-001, ¶ 34, 387 P.3d 885 ("For this Court to rule on an inadequately briefed constitutional issue would essentially require us to do the work on behalf of the [d]efendant, which we will not do.")*, cert. denied*, ___-NMCERT-___ (No. S-1-SC-35993, Aug. 8, 2016).

**{30}** Consequently, although the presentation of evidence clearly could have been handled in a potentially less-confusing manner, we are not persuaded that fundamental error occurred when the jury viewed the entire admitted interrogation video (minus the portions deemed inadmissible by the district court) during its deliberations.

**CONCLUSION**

**{31}** Therefore, for the reasons stated above, we affirm.

**{32}** **IT IS SO ORDERED.**

_____

**DANIEL J. GALLEGOS, Judge**

18

**WE CONCUR:**

_____
**J. MILES HANISEE, Judge**

_____
**HENRY M. BOHNHOFF, Judge**